IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RACHAEL BLACK<br>7495 Wisdom Lane<br>Dublin, Ohio 43016 | :<br>:<br>: | Case No. 2:21CV2987 |
| Plaintiff, | : | |
| vs. | : | Judge Morrison |
| STATE OF OHIO<br>OHIO INDUSTRIAL COMMISSION<br>30 West Spring Street<br>Columbus, Ohio 43215 | :<br>:<br>:<br>: | MAGISTRATE JUDGE JOLSON |
| and | : | |
| JAMES HUGHES, CHAIRMAN<br>Ohio Industrial Commission<br>30 West Spring Street<br>Columbus, Ohio 43215 | :<br>:<br>:<br>: | FILED<br>2021 JUN -1 AM 11:49<br>RICHARD W. NAGEL<br>CLERK OF COURT<br>U.S. DISTRICT COURT<br>SOUTHERN DIST. OHIO<br>EAST. DIV. COLUMBUS |
| and | : | |
| TIMOTHY ADAMS, EXECUTIVE DIRECTOR<br>Ohio Industrial Commission<br>30 West Spring Street<br>Columbus, Ohio 43215 | :<br>:<br>:<br>: | |
| Defendants. | : | |

**COMPLAINT**
**(JURY DEMAND ENDORSED HEREON)**

Plaintiff Rachael Black states the following as her Complaint for claims arising under Title VII

of the Civil Rights Act Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color,

1

gender, religion, national origin); the Ohio Laws Against Discrimination, R.C. Chapter 4112, and the Equal Pay Act 1963, 29 U.S.C., Chapter 8 §206(d).

## JURISDICTION AND VENUE

1. This action arises under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.; 42 U.S.C. §1981, the Ohio Laws Against Discrimination, R.C. Chapter 4112; and the Equal Pay Act 1963, 29 U.S.C., Chapter 8 §206(d).
2. This court has jurisdiction by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).
3. Venue is proper pursuant to 28 U.S.C. §1391 as the events giving rise to the causes of action occurred in Franklin County, Ohio, within the Southern District of Ohio, Eastern Division.

## PARTIES

4. Plaintiff Rachael T. Black is a Hispanic female attorney, who has been employed with Defendant, Ohio Industrial Commission, since January 25, 1993. At all times material to this Complaint, Plaintiff was over the age of 18 and a resident of Union County, Ohio.
5. Defendant Ohio Industrial Commission is an agency of the State of Ohio charged with the expeditious and impartial adjudication of claims arising from Ohio's workers' compensation system. The Ohio Industrial Commission is headquartered in the City of Columbus, Franklin County, Ohio. At all times material herein, the Defendant Ohio Industrial Commission has had supervisory and managerial authority over Plaintiff, is an

2

employer under the provisions of 42 U.S.C. 2000e(b) and is a necessary and indispensable party for the purpose of effecting remedial and injunctive relief.

6. Defendant James Hughes, white male, employed as the Chairman of the Ohio Industrial Commission, headquartered in Columbus, Franklin County, Ohio. At all times material herein, Defendant Hughes has had supervisory and managerial authority over Plaintiff, and is a necessary and indispensable party for the purpose of effecting remedial and injunctive relief.

7. Defendant Timothy Adams, white male, employed as the Executive Director of the Ohio Industrial Commission, headquartered in Columbus, Franklin County, Ohio. At all times material herein, Defendant Adams has had supervisory and managerial authority over Plaintiff, and is a necessary and indispensable party for the purpose of effecting remedial and injunctive relief.

## Statement of Claim

8. On January 25, 1993, Defendant Ohio Industrial Commission hired Plaintiff as an Attorney II in the classified civil service and later promoted Plaintiff to the position of District Hearing Officer, also in the classified civil service, in or around September 1995.

9. Plaintiff performed the duties of the District Hearing Officer position in an exemplary fashion for fifteen years, earning commendations for an exemplary order the Supreme Court of Ohio reviewed favorably in a mandamus action and two Employee of the Month awards based on nominations from her immediate supervisors, managers of two separate units within the Ohio Industrial Commission. Plaintiff's job duties also included the

training of new District Hearing Officers and the Hearing Officer Trainer issued Plaintiff a commendation for her performance of that specific duty.

10. In 2010, the Ohio Industrial Commission appointed Plaintiff to the unclassified service in the position of Legal Research Unit supervisor, a position that reported directly to then Chief Legal Counsel, Paul Walker, a white male. In this position, Plaintiff conducted legal research, drafted contracts, reviewed and drafted administrative rules, and supervised the employees in the unit.

11. On March 10, 2013, then-Chairperson Jodie M. Taylor appointed Plaintiff to the position of Deputy Chief Legal Counsel within the Administration Department of the Ohio Industrial Commission, under the supervision of then Chief Legal Counsel, Gerald Waterman, a white male.

12. Thereafter, in October of 2013, then-Chairman Thomas Bainbridge appointed Plaintiff to the position of Chief Legal Counsel within the Administration Department of the Ohio Industrial Commission. Plaintiff's rate of pay was $46.49 per hour, substantially lower than the pay rate of her white male predecessors.

13. When Plaintiff requested to be paid commensurate with her predecessors, Defendant Adams claimed that the Office of Governor Kasich would only authorize a 4% increase for promotions. Plaintiff accepted the position at the proffered rate of pay because she feared that the Ohio Industrial Commission would revoke her appointment to the Chief Legal position.

14. Six months later, Plaintiff again inquired about the discrepancy in her pay and Defendant Adams indicated that it was not a good time to discuss the issue because the agency was in the process of presenting its proposed budget to the Ohio Legislature.

4

15. In October of 2014, Plaintiff again requested a pay increase when she learned that Jacob Bell, a white male, former Director of Operations and Legislation, had recently received a significant pay raise. Mr. Bell reported to and was a close friend of Mr. Adams. This time, Defendant Adams indicated that it was not a good time to ask for a pay raise because Governor Kasich was running for reelection.

16. Despite the disparate pay, Plaintiff performed this position in an exemplary manner, again receiving an Employee of the Month award as well as being assigned numerous additional responsibilities that had not previously been performed by the Chief Legal Counsel.

17. Upon being appointed to Administration, Defendant Adams, Mr. Bell and Mr. Michael Tanner, the Director of Security, began to refer to Plaintiff as "the Rican" and would joke that she would "cut you if she became angry."

18. Mr. Bell and Mr. Tanner would also complain that Plaintiff got "too fired up" about issues because she was Puerto Rican.

19. When Plaintiff advocated strongly for a position, Defendant Adams would tell the Commission Members and their legal assistants that Plaintiff was "going Rican."

20. In October of 2015, Mr. Bainbridge assigned Plaintiff to schedule witnesses for an investigation involving an allegation that Mr. Bell had falsified an employee's timesheet. When Mr. Bell became aware that Plaintiff was scheduling the interviews, he came into her office, slammed the door shut and screamed at her for fifteen minutes. Because the door was locked, an employee informed Defendant Adams that she feared for Plaintiff's safety given Mr. Bell's behavior. Defendant Adams waited five minutes and then investigated the matter. Despite the fact that Mr. Bell admitted that he had lost his temper

and Plaintiff informed him that she was intimidated by Mr. Bell, Defendant Adams did not take any action to discipline his friend and subordinate, Mr. Bell.

21. In February of 2018, Chairman Bainbridge re-assigned the Human Resources Department from Mr. Bell (who reported to Defendant Adams) to Plaintiff at the request of the Director, Jessica Schuster, white female, who alleged that Defendant Adams and Mr. Bell were harassing her and her female employees, causing her and them emotional distress.

22. Mr. Bainbridge revoked Mr. Bell's appointment upon receipt of a Security Services Report of Investigation, dated August 21, 2018, from Chris Minter, the Director of Security Services. Mr. Minter had investigated an allegation from Commissioner Karen Gillmor, Ph.D., who reported that she was afraid of Mr. Bell and afraid for her safety because she believed Mr. Bell was unstable and that his condition was worsening. Mr. Minter found that eight female witnesses, who Mrs. Gillmor had asked Mr. Minter to interview during the investigation, had described incidents with Mr. Bell that contained elements of a hostile work environment.

23. Effective July 1, 2019, Governor Michael DeWine appointed James Hughes to the Ohio Industrial Commission as the new chairman.

24. On July 11, 2019, Defendant Hughes requested a meeting with Plaintiff for a status update on all pending litigation in which the Ohio Industrial Commission was a party. In preparation for the meeting, Plaintiff provided Defendant Hughes a lengthy summary of the multiple mandamus actions pending before the Franklin County Court of Appeals and the Supreme Court of Ohio, the complaints pending before the Equal Employment

Opportunity Commission and the Ohio Civil Rights Commission, and one case pending in the Ohio Court of Claims.

25. At this meeting, Defendant Hughes derided Plaintiff's summary, noting that she had already provided a synopsis of much of that information in her weekly reports, and demanding to discuss the case of Jacob Bell, the former Ohio Industrial Commission Director of Operations/Legislation, whose appointment former Chairman Bainbridge had revoked in August 2018.

26. When Plaintiff explained that Mr. Bell did not have any complaints or actions pending against the Ohio Industrial Commission, Defendant Hughes insisted Plaintiff provide him a history of the events leading up to the revocation of Mr. Bell's appointment at the Ohio Industrial Commission.

27. Plaintiff provided Defendant Hughes the requested information, noting that she was one of the eight female witnesses interviewed by Mr. Minter. In response, Defendant Hughes indicated that the investigation was unfair and that, therefore, the Ohio Industrial Commission should not have revoked Mr. Bell's appointment. Defendant Hughes then stated that "we need to help Mr. Bell get his job back with the state."

28. Several days later, Defendant Hughes scheduled a meeting to discuss a recommendation Plaintiff provided the Commission Members about a workers' compensation claim for which an issue was pending in the common pleas court. Defendant Hughes informed Plaintiff that he disagreed with her recommendation for action in the claim because the claim was in court. When Plaintiff explained the reason for her recommendation, Defendant Hughes shouted at Plaintiff that he could not believe she was the agency's chief legal counsel, that she was incompetent, and that she should immediately contact

the Ohio Attorney General's office and request that they "train her properly." As Defendant Hughes dismissed Plaintiff from his office, he again shouted that he expected her to contact the Ohio Attorney General's office since she "did not know the law."

29. On or about July 17, 2019, Defendant Hughes requested a meeting with Plaintiff to discuss how he could develop a working relationship with the other two Commissioners, Mrs. Gillmor and Ms. Taylor. At the meeting, Defendant Hughes inquired about the other Commissioner's demeanors and specifically asked if they were "difficult." Defendant Hughes stated that Defendant Adams had informed him that both Commissioners had bad tempers and acted unreasonably. When Plaintiff responded that she worked well with the other Commission Members, Defendant Hughes commented that it was because she was female.

30. On July 25, 2019, Defendant Hughes revoked Plaintiff's appointment as Chief Legal Counsel, claiming he was "going in a new direction."

31. Plaintiff immediately provided Defendant Hughes a letter, informing him that she was exercising her right to fall back into the position of District Hearing Officer, the position she had held previously in the classified civil service.

32. Defendant Hughes refused to honor Plaintiff's fall-back rights , claiming that Plaintiff did not have said rights.

33. Plaintiff again asserted that she had the right to exercise her fall-back rights and emphasized that the Ohio Industrial Commission had just previously honored a similarly-situated white male's fall back rights, immediately returning him to the District Hearing Officer position he had held prior to being appointed to an exempt position.

Despite this information, Defendant Hughes demanded that Plaintiff leave his office and that she be escorted from the premises immediately.

34. The following day, Plaintiff contacted the Human Resources Director, Doreena Colasurd, white female, via email and telephone multiple times to inquire whether the Ohio Industrial Commission was going to honor her fall-back rights. Ms. Colasurd did not return Plaintiff's call until the end of the business day, informing her that she was to report to the Office of Human Resources the following Monday.

35. On July 29, 2019, Plaintiff reported to Human Resources and Ms. Colasurd informed her that Defendant Hughes had agreed to place Plaintiff into a District Hearing Officer position, at an hourly rate pay of $51.64, a decrease in pay of $5.61 per hour.

36. Ms. Colasurd then escorted Plaintiff to a workstation across from a noisy breakroom and the men's restroom despite the fact that there were other pods available on the floor that were situated in quieter locations. When Plaintiff inquired why Ms. Colasurd was seating her in that particular workstation, Ms. Colasurd replied that Defendant Hughes and Defendant Adams had personally surveyed the floor and picked the location of her work station. To Plaintiff's knowledge, the Commission had never taken this action with respect to similarly-situated employees in the past.

37. At his time, Defendant Hughes changed Plaintiff's internal phone number that she had had since her start date with the agency without providing Plaintiff any notice of the change and had all of her emails deleted from her email box. To Plaintiff's knowledge, the Commission had never taken this action with respect to similarly-situated employees in the past.

38. Plaintiff also did not have access to the multitude of documents she had saved on her computer during her more than twenty-six year tenure with the agency. To Plaintiff's knowledge, the Commission had never taken this action with respect to similarly-situated employees in the past.

39. One week later, Defendant Hughes replaced Plaintiff with Jim Burkart, a white male, with only twelve years experience as a licensed attorney and no workers' compensation experience or supervisory experience.

40. Mr. Burkart, white male, was paid $56.00 per hour in 2019 for his first year as Chief Legal Counsel, which is approximately 20% higher than Plaintiff's pay for her first year as Chief Legal Counsel.

41. On or about July 29, 2019, Commissioner Taylor emailed Matt Donahue, Chief Legal Counsel for the Office of Governor Mike DeWine, white male, objecting to the revocation of Plaintiff's appointment as Chief Legal Counsel, asserting that Defendant Hughes' revocation violated R.C. 4121.03(C)(2) and (3). To Plaintiff's knowledge, Mr. Donohue did not respond to this email.

42. On August 9, 2019, Commissioner Taylor followed up with Mr. Donahue regarding her earlier email to him, again noting that Defendant Hughes' revocation of Plaintiff's appointment as Chief Legal Counsel was in contravention of Ohio law.

43. On August 20, 2019, Plaintiff met with Bob Osborne, IT deputy director, and requested access to all of her computer files, saved documents and the internal phone number she had been assigned for 26 years. Mr. Osborne informed Plaintiff that Defendant Adams had personally directed IT to remove Plaintiff's access to all the documents that Plaintiff had saved through the years, to delete Plaintiff's email account, and not to transfer

Plaintiff's internal phone number to her new workstation, actions that Mr. Osborne said had never been taken against any other employee during his 30 year tenure.

44. Mr. Osborne offered to ask Defendant Adams for permission to allow Plaintiff access to any documents she had saved while she was a District Hearing Officer so that she could properly perform the job duties of her current position. However, Defendant Adams generally denied this request and only granted Plaintiff permission to have access to any documents for which she could recall the title she placed on the documents.

45. On October 4, 2019, Plaintiff met with her manager, Felicity Hillmer, to request permission to relocate to another workstation because the one to which Defendant Hughes and Defendant Adams had assigned Plaintiff was very noisy and the smells from the breakroom were overwhelming.

46. Ms. Hillmer informed Plaintiff that she did not have the authority to permit Plaintiff to move to another workstation. Ms. Hillmer indicated that she had previously inquired whether she could move Plaintiff to any of four more desirable workstations on the floor and Defendant Hughes had emphatically responded that Ms. Hillmer could not move Plaintiffs workstation. Prior to the revocation of Plaintiff's appointment as Chief Legal Counsel, Ms. Hillmer had the unfettered authority to assign her employees to workstations at her discretion and had always allowed movement on the floor based on seniority.

47. On July 21, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Charge No. 532-2020-02391.

48. On March 2, 2021, the Equal Employment Opportunity Commission issued Plaintiff a Right to Sue Letter.

### Count 1: Discrimination/Harassment Based on Race: Strict Liability & Hostile Work Environment

49. Plaintiff reincorporates as if fully alleged herein the foregoing paragraphs of the Complaint.

50. Plaintiff is a member of a protected class based on her Hispanic heritage of Puerto Rican descent.

51. Plaintiff was qualified to perform her job and performed it in an exemplary manner.

52. Plaintiff was subject to discrimination and harassment based on her race by her supervisors.

53. The supervisory race-based harassment resulted in a negative employment action including an attempted termination, ultimate demotion, and loss of wages.

54. Plaintiff's position was filled by an unqualified white man who was paid more than Plaintiff.

55. Defendants are strictly liable for the race-based discrimination under state and federal law.

56. Defendants' race-based harassment of Plaintiff was severe and pervasive.

57. Defendants knew, or should have known, about the harassment and failed to take prompt and appropriate corrective action.

58. Plaintiff found the environment hostile.

59. A reasonable person in Plaintiff's position, considering all the circumstances, would find the environment hostile.

60. Defendants are liable for the hostile work environment under state and federal law.

### Count 2: Discrimination/Harassment Based on Gender: Strict Liability & Hostile Work Environment

61. Plaintiff reincorporates as if fully alleged herein the foregoing paragraphs of the Complaint.
62. Plaintiff is a member of a protected class based on her sex.
63. Plaintiff was qualified to perform her job and performed it in an exemplary manner.
64. Plaintiff was subject to harassment based on her sex by her supervisors.
65. The supervisory sex-based harassment resulted in a negative employment action including an attempted termination, ultimate demotion, and loss of wages.
66. Plaintiff's position was filled by an unqualified white male who was more than Plaintiff.
67. Defendants are strictly liable for the sex-based discrimination under state and federal law.
68. Defendants' sex-based harassment of Plaintiff was severe and pervasive.
69. Defendants knew, or should have known about the harassment and failed to take prompt and appropriate corrective action.
70. Plaintiff found the environment hostile.
71. A reasonable person in Plaintiff's position, considering all the circumstances, would find the environment hostile.
72. Defendants are liable for the hostile work environment under state and federal law.

## Count 3: Equal Pay Violations

73. Plaintiff reincorporates as if fully alleged herein the foregoing paragraphs of the Complaint.
74. Defendant-employer paid different wages to employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, which jobs all are performed under similar working conditions.

**WHEREFORE,** Plaintiff Rachael Black prays for judgment in her favor, back pay, front pay or reinstatement, pain and suffering, compensatory and non-economic damages in an amount exceeding $75,000, attorneys' fees when counsel is retained, costs, pre- and post-judgment interest, and any other relief to which she may be entitled.

Respectfully Submitted,

*[signature]*

Rachael Black (59653)
7495 Wisdom Lane
Dublin, Ohio 43016
(614)354-6311
*Pro Se* Litigant