IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Rachael Black,

    Plaintiff,

v.

State of Ohio Industrial Commission, *et al.*,

    Defendants.

Case No: 2:21-cv-2987

Judge Graham

Magistrate Judge Jolson

<u>Opinion and Order</u>

Plaintiff Rachael Black brings this employment discrimination suit relating to her removal from the position of Chief Legal Counsel for the State of Ohio Industrial Commission. Ms. Black, who is Puerto Rican, asserts claims under Title VII of the Civil Rights Act of 1964 for gender discrimination and national origin discrimination. She also asserts a claim under the Equal Pay Act.

Defendants are the Ohio Industrial Commission and its Chairperson James Hughes and Executive Director Timothy Adams. This matter is before the Court on defendants' motion for summary judgment. Defendants argue that plaintiff's discrimination claims fail because Hughes had a legitimate, non-discriminatory reason to revoke Black's appointment as Chief Legal Counsel. They argue that plaintiff's Equal Pay Act claim fails because she received a higher rate of pay than the man who succeeded her.

For the reasons stated below, the Court grants defendant's motion for summary judgment.

**I.    Background**

    **A.    Facts**

The Ohio Industrial Commission was created to provide a forum for the adjudication and resolution of disputed workers' compensation claims. *See* O.R.C. § 4121.02(A). The Commission is comprised of three members appointed by the Governor, with the consent of the Ohio Senate. *See id*. One member serves as the Chairperson, at the pleasure of the Governor, and is the head of the Commission. *See* O.R.C. § 4121.03(A). The Chairperson has the authority to hire hearing officers and staff and to appoint an Executive Director, who manages the Commission's day-to-day operations. *See* O.R.C. § 4121.03(B), (C). The daily operations include supervising the hearing officers who resolve claims and determine eligibility for disability benefits.

1

Black began her employment with the Commission in 1993 and served as a hearing officer for many years. In October 2013, she was appointed to Chief Legal Counsel by then-Chairperson Thomas Bainbridge. *See* Doc. 53-8 at PAGEID 913. Her initial rate of pay as Chief Legal Counsel was $48.12 per hour. *See* Doc. 53-7 at PAGEID 907.

The position of Chief Legal Counsel is in Ohio's unclassified civil service. *See* Ohio Rev. Code § 124.11(A)(9); Doc. 53-8 at PAGEID 915; Colasurd Aff., ¶ 5. It is undisputed that the position was at will and at the pleasure of the Chairperson. *See* Black Dep. at 124; Hughes Aff., ¶ 6. Black's job duties included ensuring the Commission's compliance with applicable law, making recommendations to the Chairperson, assigning hearing officers to matters, and acting as a liaison to the Bureau of Workers' Compensation. *See* Doc. 53-8 at PAGEID 914–915; Feb. 15, 2023 Black Aff., ¶ 5; Black Dep. at 236–241.

Plaintiff alleges that during the first three years of her tenure as Chief Legal Counsel, certain co-workers referred to her Puerto Rican national origin in a demeaning manner. Namely, defendant Adams and two directors, Jacob Bell and Michael Tanner, referred to her as "the Rican." They did so outside of her presence. Black became aware of the matter when other employees told her about it. *See* Black Dep. at 98, 100, 101. Black testified that Tanner also said, "You're going Rican," directly to her during a disagreement. *Id.* at 82. Black believes that Tanner used the phrase to mean that she was getting "fired up" or upset. *Id.* Black further testified that she was told that Adams, outside of her presence, used the phrase "going Rican" in reference to her. *Id.* at 90, 96. Adams denies that he made any such comment about Black. *See* Adams Aff., ¶ 3.

Black's tenure as Chief Legal Counsel came to an end in late July 2019. *See* Doc. 53-5 at PAGEID 902. This occurred shortly after defendant Hughes became the Commission's new Chairperson.

Hughes had served as a legislator in both the Ohio House of Representatives and Ohio Senate. *See* Hughes Aff., ¶¶ 2, 4. When Mike DeWine became Governor in 2019, Hughes decided that he would pursue an appointment as head of an executive agency. *See* Hughes Dep. at 11. He first interviewed for a position with the Department of Insurance and then for the Industrial Commission. *See id.* at 11–12. Hughes had pre-determined that if he received an executive appointment he would hire James Burkart as his chief legal counsel. *See id.* Hughes had received advice from a mentor that, if he were to receive such an appointment, he should hire legal counsel whom he knew and trusted. *See id.* at 12. Hughes had known Burkart for about 20 years and was friends with him. *See id.* at 10. Hughes believed that Burkart had the right background experience,

and another attorney whom Hughes knew had "highly recommended" Burkart for a chief legal counsel position.  *Id.* at 11.  Hughes testified in his deposition, "So before I even came into the Industrial Commission, I knew I was going to bring him [Burkart] in, wherever I went with the State, as my legal counsel."  *Id.* at 12.  Hughes had never met Black prior to being appointed as Chairperson.  *See id.* at 11.

Governor DeWine appointed Hughes as Chairman of the Commission effective July 1, 2019.  *See* Hughes Aff., ¶ 1.  Hughes met with Black on July 11, 2019 to review "current actions pending before the courts and administrative agencies."  March 7, 2023 Black Aff., ¶ 8.  According to Black, Hughes became sidetracked on the topic of former director Jacob Bell, who had been terminated for intimidating female employees.  Hughes expressed his opinion that the internal investigation conducted of Bell was "unfair" and that he wanted to give Bell his job back.  *Id.*

Over the following two weeks, Black had a couple of interactions with Hughes.  Black states that on one occasion, Hughes disagreed with a recommendation she had made and called her "incompetent."  *Id.*, ¶ 9.

On another occasion, around July 17, Hughes met with Black to discuss "how he could develop a working relationship with the two other Commissioners."  *Id.*, ¶ 10.  Hughes reported to Black that he had been told by Adams that "their demeanors were 'difficult.'"  *Id.*  When Black said that she worked well with the other two Commissioners, both of whom were women, Hughes responded that it was because Black was a female.  *Id.*

On July 25, Hughes met with Black and informed her that he was revoking her appointment as Chief Legal Counsel.  *Id.*, ¶ 11; Hughes Aff., ¶ 6.  According to Hughes, he hired Burkart because he trusted him and because he was qualified for the job.  *Id.*, ¶ 7.  The decision had "nothing to do with [Black's] sex/gender or national origin."  *Id.*, ¶ 6.

When informed of Hughes's decision, Black stated that she wanted to exercise her "fall-back rights" to return to her position as a hearing officer.  *See* Black Dep. at 112; Hughes Dep. at 22.  Hughes offered that he would reach out to an individual in the Governor's office to help her if she wanted to pursue a legal counsel position with another agency.  *See* Black Dep. at 112–113; Hughes Dep. at 22.  Black contends that in the July 25 meeting Hughes opposed her assertion of fall-back rights on the grounds that she "did not have such rights."  March 7, 2023 Black Aff., ¶ 11.

Hughes allowed Black to take Friday, July 26 off work to consider her options.  *See* Black Dep. at 115; Hughes Dep. at 22.  On July 26, Hughes issued a letter to Black memorializing that her

3

employment as Chief Legal Counsel was terminated effective July 29 and that she had a right to fall back to previously-held position in the classified civil service. *See* Doc. 53-5.

On Monday, July 29, Black reported to the Commission's human resources department to notify them that she was exercising her fall-back rights. *See* Black Dep. at 115. Black signed a letter giving notice that she had exercised her right to return to a hearing officer position. *See* Doc. 53-5.

At the time of her termination, Black earned a salary of $58.82 per hour as Chief Legal Counsel. *See* Doc. 53-7 at PAGEID 906. When Burkart began at that position on July 30, 2019, he earned $56.00 per hour. *See* Colasurd Aff., ¶ 7. Burkart's pay increased to $57.12 per hour on December 22, 2019 and to $58.83 per hour on April 11, 2021. *See id.*, ¶¶ 8–9.

The Human Resources Director, Doreena Colasurd, met with Black on July 29 to assign her to a workstation as a hearing officer on the seventh floor of the William Green Building in Columbus. *See* March 7, 2023 Black Aff., ¶ 16; Colasurd Aff., ¶ 4. According to Colasurd, she allowed Black to choose among available cubicles, but Black says that Colasurd gave her no choice and took her to a cubicle "located across from the break room and men's restroom." March 7, 2023 Black Aff., ¶ 16. Black believes – based on a statement that Colasurd or an office manager made to her – that Hughes and Adams decided which cubicle she would have. *See* Black Dep. at 153; March 7, 2023 Black Aff., ¶¶ 15, 17. Black contends that they put her near the break room and restroom, where there was noise and food smells, in an effort to retaliate against her.[1] *See id.*, ¶ 15.

Black further states that when she returned to her position as hearing officer, her phone number was changed and her access to her previous work files and emails was restricted. *Id.*; Black Dep. at 131, 142. Black believes that she was treated "as if I was a new employee." *Id.* at 142.

**B.     Procedural History**

Plaintiff filed a charge with the Equal Employment Opportunity Commission on July 21, 2020 and received a Right to Sue letter on March 2, 2021. Plaintiff filed her complaint in this case on June 1, 2021. She has twice been granted leave to amend her complaint.

---

[1] Black does not explain in her affidavit or other filings what she means by "retaliation." In particular, she has not identified the protected activity which caused Hughes and Adams to retaliate against her. In one of her briefs, Black says that she experienced retaliation for being the first female and first Hispanic Chief Legal Counsel. *See* Doc. 57 at PAGEID 1180. In that sense, she appears to use "retaliation" as a way of saying that she was discriminated against on the basis of her gender and national origin.

In any event, the Second Amended Complaint does not assert a claim for retaliation, nor did Black's charge with the United States Equal Employment Opportunity Commission. *See* Doc. 37-2 at PAGEID 239 (EEOC charge form, on which plaintiff did not check the box for a retaliation claim).

Counts I and II of the Second Amended Complaint assert claims of national origin discrimination under Title VII, 42 U.S.C. § 2000e-2(a), and state law. Counts III and IV assert claims of gender discrimination under Title VII and state law. The complaint alleges that defendants discriminated against plaintiff by revoking her position as Chief Legal Counsel, by initially refusing to honor her fall-back rights, and by treating her less favorably than non-Hispanic, male employees in the terms and conditions of employment.

Count V asserts a violation of the Equal Pay Act, 29 U.S.C § 206(d)(1). The complaint alleges that plaintiff was paid less than her male counterparts.

In an earlier Opinion and Order, the Court granted in part and denied in part defendants' motion to partially dismiss the complaint. *See* Doc. 43. Defendants' motion addressed two issues. The first concerned a potential claim for hostile work environment under Title VII. The complaint did not assert a hostile work environment claim, but it contained allegations about Black being the subject of comments referring to her as "the Rican" and as "going Rican." Defendants argued that to the extent the complaint could be construed as alleging a hostile work environment claim, such a claim must be dismissed because plaintiff failed to include those allegations in her EEOC charge and had not exhausted her administrative remedies. Plaintiff did not oppose the motion, and the Court agreed that her EEOC charge did not allege any facts from which a hostile work environment claim could be reasonably expected to arise. The EEOC charge focused solely on the revocation of Black's position as Chief Legal Counsel and the allegedly unfavorable treatment she received when she returned to the hearing officer position.

Second, defendants argued that plaintiff's Equal Pay Act claim was time-barred, at least in part. A three-year statute of limitations applies to willful violations of the Act. *See* U.S.C. § 255(a). The Court held that the complaint alleged a willful violation and that plaintiff could pursue her claim only for allegedly unequal paychecks received from June 1, 2018 through the revocation of her position on July 29, 2019. Thus, any claim based on alleged pay disparities relative to Black's predecessors was barred, as her rate of pay on June 1, 2018 exceeded that of her predecessors.

With respect to alleged pay disparities relative to Black's successor, Jim Burkart, defendants argued that Black's claim failed because her final rate of pay exceeded his initial rate of pay. The Court found that the claim should survive the motion to dismiss because defendants had relied on payroll records outside of the pleadings and because plaintiff had alleged that Burkart, soon after taking the job, quickly advanced in pay in a manner she had not.

5

The parties have now conducted discovery and defendants have moved for summary judgment. Black has filed a cross-motion for summary judgment on her Equal Pay Act claim.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

**III. Discussion**

    **A.**    **Title VII Discrimination Claims[2]**

Title VII provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).

Black has not offered any direct evidence of discrimination. Therefore, her claims are examined under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). A plaintiff must first establish a *prima facie* case of disparate treatment. *Burdine*, 450 U.S. at 253. She does so by demonstrating that she: (1) is a member of a protected class, (2) was qualified for her job, (3) suffered an adverse employment action, and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023).

If plaintiff satisfies her *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 253. Plaintiff will then an opportunity to prove that the legitimate reasons offered by the defendant were a pretext for discrimination. *Id.*

Black's claims for gender and national origin discrimination can be separated into three distinct theories based on the following alleged adverse actions: the revocation of her job as Chief Legal Counsel; Hughes's initial refusal to honor her fall-back rights; and the unfavorable treatment she received when she returned to the hearing officer position. The Court will analyze these theories in turn below.

        **1.**    **Revocation of Black as Chief Legal Counsel**

Defendant concedes that Black has demonstrated a *prima facie* case of discrimination as it relates to the revocation of her job as Chief Legal Counsel. Black is a member of a protected class (both as a female and a Puerto Rican) and was qualified for the job, terminated from the position, and replaced by a white male.

---

[2] In response to defendants' motion to dismiss, Black concedes that Hughes and Adams do not meet Title VII's definition of an "employer," and she has clarified that her Title VII claims are against the Commission. Doc. 57 at PAGEID 1190. *See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997).

7

The burden shifts to defendant to establish a legitimate, nondiscriminatory reason for why Hughes revoked her position. Defendant has met its burden. Following a change in Governor, Hughes pursued a political appointment to head an executive agency. Hughes had decided, based on advice he had been given, that he would make Burkart his chief legal counsel if he received such an appointment. *See* Hughes Dep. at 11–12. He did not know Black, but he had known Burkart for 20 years and trusted him. *Id.* at 10–11. Once the Governor appointed him as Chairperson of the Industrial Commission, Hughes followed through on his plan. The Court finds that defendant has made a showing that Hughes's revocation of Black was not based on her gender or national origin.

The burden now shifts to plaintiff to show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. Pretext can be established directly by a showing that "a discriminatory reason more likely motivated the employer" or indirectly by a showing that "the employer's proffered explanation is unworthy of credence." *Id.* at 256. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Levine*, 64 F.4th at 798 (internal quotation marks omitted).

Black argues that Hughes had an "inherent bias against women" which actually motivated his decision.[3] Doc. 57 at PAGEID 1193. The evidence which potentially supports Black's assertion is the following: Hughes's statement about the investigation of former director Jacob Bell being "unfair"; Hughes's discussion with Black about the potential difficulty of working with the other two Commissioners; and Hughes's decision not to revoke the employment of two, executive-level male employees.

With respect to the first matter, Black stated in her deposition that she met with Hughes soon after he became Chairperson. *See* March 7, 2023 Black Aff., ¶ 8. Hughes mentioned Bell, who had been fired for intimidating female employees. According to Black, Hughes said that the investigation of Bell was "unfair" and that he wanted to give Bell his job back. *Id.*

Without more, this evidence does not support an inference that Hughes had an anti-female bias. Black did not, in either her affidavit or deposition, describe the basis for why Hughes believed the investigation was unfair. And despite having an opportunity to depose Hughes, plaintiff did not

---

[3] In attempting to show pretext, plaintiff focuses on gender bias as the motivating factor. Her only mention of national origin bias is defendant Adam's allegedly calling her "the Rican." Doc. 57 at PAGEID 1193. However, Adams did not participate in the decision to revoke Black's position and his alleged comment predated Hughes's decision by at least three years.

examine him about this matter. Hughes could have had any number of reasons, including procedural ones, for calling the investigation unfair. With the burden on plaintiff to demonstrate pretext, Black must do more than speculate in her legal brief about what caused Hughes to view the investigation as unfair. *See Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 623 (6th Cir. 2003) (affirming summary judgment where plaintiff offered only "unsupported speculation" to show pretext).

Turning to the second matter, Black claims in her brief that Hughes said that "women are 'difficult.'" Doc. 57 at PAGEID 1193. This is a mischaracterization of her own sworn affidavit. According to the affidavit, Hughes came to Black seeking her advice about "how he could develop a working relationship with the two other Commissioners." March 7, 2023 Black Aff., ¶ 10. Hughes said that he had been told that "their demeanors were 'difficult." *Id.* When Black responded that she worked well with the other two Commissioners, both of whom were women, Hughes responded that it was because Black was a woman. *Id.*

Again, the evidence does not support an inference that Hughes had an anti-female bias. Hughes did not say that "women are difficult." According to Black's affidavit, he wanted to establish a good working relationship with his co-Commissioners. Hughes, who was new to the agency, did not say that the other Commissioners were difficult to work with – only that he had heard someone else say that they were. Hughes apparently reasoned that Black worked well with them because she was a woman. Here too, without more it would be speculative to infer from this statement alone that Hughes held an animus against women. Even if he thought that it might be more challenging for him, as a man, to cooperate with the other Commissioners, he did not say that he did not want to work with them because they were women. Rather, according to Black's own affidavit, Hughes expressed a desire to "develop a working relationship" with them; there is no evidence that he had a desire to avoid, ignore, exclude, or marginalize them.

As to the third matter, Black emphasizes that Hughes revoked her position but chose not to do the same for two men who were employed at the executive level. Black identifies the two men as defendant Adams and Thomas Connor, director of adjudicatory services. *See* March 7, 2023 Black Aff., ¶ 14; Black Dep. at 25, 172–73. However, plaintiff has failed to offer any evidence to provide context to the situation. That is, she has not shown that Adams and Connor were similarly situated to her, such that Hughes's purported reason for installing his own Chief Legal Counsel would have required him to have also replaced Adams and Connor.

9

The only evidence on this issue cuts against plaintiff. In his deposition, Hughes explained that his reason for bringing in Burkart was specific to the Chief Legal Counsel position. Hughes, himself an attorney, stated that he had once worked for a county judge. *See* Hughes Dep. at 12. The judge advised him that if he were ever in the position in which Hughes later found himself, that in selecting "[my] own legal counsel, make sure you get the person you knew." *Id.* Hughes added, "And I took that advice. So when I got this [appointment as Chairperson], this is what I did." *Id.*

The Court thus finds that plaintiff has not submitted evidence from which a jury could find that Hughes had an anti-female bias. As importantly, plaintiff also has not shown that the alleged anti-female bias actually motivated Hughes to revoke Black's position. The evidence is undisputed that Hughes had pre-determined to hire Burkart as his Chief Legal Counsel. Before seeking the appointment with the Industrial Commission, Hughes had sought an appointment with the Department of Insurance and had interviewed Burkart in March 2019 and talked with him about being his legal counsel. *See* Hughes Dep. at 11–12, 15. Hughes made a decision at that earlier time to hire Burkart if he received an appointment: "So before I even came into the Industrial Commission, I knew I was going to bring him in, or wherever I went with the State, as my legal counsel." *Id.* at 12. Hughes had never met Black, and there is no evidence that he knew of her or her gender. *See id.* at 11; Hughes Aff., ¶ 6. On the record before the Court, Hughes had no reason for replacing Black other than following through with his preset plan to hire someone he knew and trusted as his legal counsel, regardless of whether the person he would be removing was a man or woman. *See* Hughes Dep. at 21; Hughes Aff., ¶ 8.

In sum, the Court finds that defendant has demonstrated that Hughes had a legitimate, nondiscriminatory reason for revoking Black as Chief Legal Counsel and that plaintiff has failed to put forth evidence from which a jury could reasonably find that Hughes's reason was pretextual.

### 2. Initial Refusal to Honor Black's Fall-Back Rights

Hughes informed Black on July 25, 2019 of his decision to revoke her appointment as Chief Legal Counsel. Black immediately asserted her right to return to a hearing officer position. Black states that Hughes initially refused to honor her rights and claimed that she "did not have such rights." March 7, 2023 Black Aff., ¶ 11.

The Court finds that plaintiff has failed to show that she suffered an adverse employment action, which she must do in order to establish a *prima facie* case. An adverse employment action is one accompanied by a "materially adverse *change* in the terms or conditions of . . . employment." *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (emphasis added).

10

Hughes's initial refusal to honor Black's rights did not cause a change in the terms or conditions of Black's employment. On the very next day, July 26, Hughes signed a letter to Black acknowledging the existence of her fall-back rights. *See* Doc. 53-5. The letter stated, "Pursuant to Ohio Revised Code Section 124.11, because you previously held a position in the classified service, you retain the right to resume the position and status held in the classified service immediately prior to your unclassified appointment." *Id.* The letter identified the fall-back position as that of a District Hearing Officer and instructed Black to indicate, with her signature, if she wished to exercise her fall-back rights. *See id.*

On the next business day, Monday, July 29, Black signed the letter and exercised her right to return to a hearing officer position. *See id.*; Black Dep. at 177–78. She did not miss any pay or experience a lapse in service or benefits as a result of Hughes's initial resistance to her assertion of fall-back rights. *See* Black Dep. at 115. Black received her salary as Chief Legal Counsel up to July 29, when she began receiving her salary as a hearing officer. *See id.*; Doc. 53-7 at PAGEID 906.

### 3. Unfavorable Treatment

Finally, plaintiff alleges that she was subjected to discriminatory treatment once she returned to the hearing officer position. She states that Hughes and Adams assigned her to an undesirable workstation situated closely to the sounds and smells of the break room and a restroom. *See* March 7, 2023 Black Aff., ¶ 15. She further claims that Hughes and Adams had her phone number changed and restricted her access to her previous work files and emails. *Id.*; Black Dep. at 131, 142.

The evidence largely supports Black's version of what occurred when she returned to being a hearing officer. Her belongings were moved from one floor of the William Green Building to the seventh floor, where district hearing officers and their support staff work. *See* March 7, 2023 Black Aff., ¶ 16; Hillmer Dep. at 12–13. The workstations of hearing officers were in the nature of cubicles, which were clustered in pairs or groups of four. *See* Hillmer Dep. at 13; Doc. 51-1. Black was assigned to a cubicle that was set up with a computer and telephone. *See* Hillmer Dep. at 65; March 7, 2023 Black Aff., ¶ 16. Black was given a new phone number, her email was reset (such that her inbox was empty), and she did not have access to her prior computer work files. *See* Black Dep. at 130–31, 142. Black described it as being like "a new employee." *Id.* at 142.

The Commission's office manager, Felicity Hillmer, agreed in her deposition that Black's cubicle was not in the most desirable location. *See* Hillmer Dep. at 18. The cubicles for hearing officers all had the same size and layout (a desk surrounded by four walls, with one side having an opening as an entryway). *See id.* at 13, 14, 17, 18. So the desirability of a cubicle could be gauged by

its location, particularly if in a quieter area or near a window. *See id.* at 18. Black's cubicle had neither of those advantages. It was one of many which were interior-oriented, meaning that its entryway did not face a window and that it was relatively close to the common areas of the seventh floor. *See* Doc. 51-1 (diagram of the seventh floor, with Black's cubicle identified as #7); Hillmer Dep. at 31, 36, 44. The common areas included the elevators, stairs, two restrooms, break room/kitchenette, and freight elevators. *See* Doc. 51-1

Seniority governed who received the most desirable cubicles. *See* Hillmer Dep. at 24. The cubicle to which Black was assigned went to new hearing officers.[4] *See id.* at 19–20, 37. The entry to her cubicle faced an interior wall. *See id.* at 31–32. Around the corner, less than 10 yards away was the break room, which Hillmer described as a kitchenette. *See id.* at 31, 34–35, 40–42; Doc. 51-1. A restroom was a few more yards past the break room. *See* Hillmer Dep. at 41–42; Doc. 51-1. The break room was no larger than the size of one of the cubicles. *See* Doc. 51-1. According to Hillmer, employees would "congregate and chitchat" there. Hillmer Dep. at 42. The cubicle walls did not reach the ceiling, but were open on top. *See id.* at 46; Black Dep. at 155. This meant that someone in Black's cubicle would be able to hear noise and smell food in the morning and at lunch. *See* Hillmer Dep. at 42–43; Black Dep. at 154–55.

Defendant argues that the conditions of which Black complains do not constitute an adverse employment action. An employment action is adverse when it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998). Changes in work conditions can be an adverse action if they are "evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (internal quotation marks omitted). A "materially adverse change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (internal quotation marks omitted). "The Sixth Circuit has consistently held that de minimis employment actions are not materially adverse and, thus, not actionable." *Bowman v.*

---

[4] Black soon moved to a cubicle near a window and away from the break room when a more senior hearing officer retired in March 2020. *See* Hillmer Dep. at 49–51. A new hearing officer took Black's old cubicle. *See id.* at 50; Doc. 51-1.

*Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). Similarly, "petty slights and trivial annoyances" do not count. *White*, 364 F.3d at 799.

The Court finds that plaintiff has not produced evidence that the conditions at issue were sufficiently serious to have prevented her from doing her work or to have amounted to diminished responsibilities as a hearing officer. She admitted that the new workstation, having "already been set up with my desktop computer and new phone, *enable[ed] me to begin working immediately*." March 7, 2023 Black Aff., ¶ 16 (emphasis added). The change of her phone number was at most a personal inconvenience, as the only impact she identified was that her children had to change their emergency contact information for her. *See* Black Dep. at 131.

As to the cleared email inbox, Black testified that she lost access to emails and documents she thought were worth saving over the years. The emails related to agency policies (regarding travel, leave, etc.) and communications from Connor, the director of adjudicatory services, about certain legal issues. *See id.* at 132, 143–44. But Black admitted that she could simply ask HR to resend the policies and ask Connor to refresh her memory on the legal issues. *See id.* at 144–45. Other emails she had saved related to "personal stuff" which had "no business purpose." *Id.* at 143.

With respect to the loss of access to work files, Black testified that she had saved legal research on various issues over the years. *See id.* at 131. Black has not established that the loss of her research prevented her from doing her job as a hearing officer. Rather, she has shown only that she found it to be convenient if she could refer back to past research when a certain issue happened to arise again. *See id.* at 134. Black conceded that this pertained only to "specific issues that we don't get a lot – you don't see frequently." *Id.*

Finally, plaintiff has not shown that the location of her cubicle from July 29, 2019 to March 2020 prevented her from doing her job or constituted materially unfavorable treatment. Other hearings officers had occupied that cubicle before her, as well as after. The noise and smells coming from the kitchenette were an unwelcome "distraction" experienced by every hearing officer who occupied the cubicle. Black Dep. at 155. It is clear from the record that Black took great personal offense at being treated as a new hire after having been at the Commission for more than 25 years.[5] However, a "bruised ego is simply not enough to constitute an adverse employment action." *Mitchell*, 389 F.3d at 182 (internal quotation marks omitted).

---

[5] Black has not argued or established that she was legally entitled under the collective bargaining agreement or agency policy to have been credited with seniority based on her prior service as a hearing officer.

### 4. Summary

The Court thus finds that defendant is entitled to summary judgment on all of plaintiff's Title VII claims.

### B. Equal Pay Act Claim

The Equal Pay Act contains the following prohibition:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

To establish a *prima facie* case of wage discrimination, plaintiff "must show that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507–08 (6th Cir. 2021) (internal quotation marks omitted).

The burden then shifts to defendant to show that the wage differential is justified under one of the affirmative defenses set forth in § 206(d)(1): a seniority system; a merit system; a system which measures earnings by quantity or quality of production; or a differential based on any other factor other than sex. *See id.* at 508. If defendant establishes an affirmative defense, the burden then shifts to plaintiff to show that "defendant's proffered explanation was pretextual." *Id.*

The difficulty for Black in establishing her *prima facie* case is that she earned a higher rate of pay than Burkart, her successor of the opposite sex. At the time of her revocation, Black earned $58.82 per hour. *See* Doc. 53-7 at PAGEID 906. Burkart's starting pay on July 30, 2019 was nearly $3 less, at $56.00 per hour. *See* Doc. 55-2 at PAGEID 981.

The Court denied defendants' motion to dismiss because Black alleged that the Commission, though initially paying Burkart less than her, quickly escalated his pay. An employer cannot evade liability under the Equal Pay Act merely by paying a male successor a "starting" wage below that of a female predecessor, only to turn around and increase his pay above that of hers. *Cf. Broadus v. O.K.*

*Indus., Inc.*, 226 F.3d 937, 942 (8th Cir. 2000) (courts may analyze EPA claim by comparing female employee's pay to the "non-immediate" pay of a male successor).

However, Black has been unable to support her allegation with evidence at the summary judgment stage. It is true that Burkart soon received a raise on December 22, 2019, but his new hourly salary of $57.12 still did not exceed hers. *See* Doc. 55-2 at PAGEID 981. Indeed, his new hourly salary did not even match the $57.25 per hour which Black had previously earned before her hourly pay was raised to $58.82. *See* Doc. 53-7 at PAGEID 906.

Defendants argue that the analysis should end here – Black's pay exceeded Burkart's pay, whether measured on the day he started or when he received a raise five months later. Defendants cite one of the regulations promulgated under the Equal Pay Act, which provides:

> If a person of one sex succeeds a person of the opposite sex on a job at a higher rate of pay than the predecessor, and there is no reason for the higher rate other than difference in gender, a violation as to the predecessor is established and that person is entitled to recover the difference between his or her pay and the higher rate paid the successor employee.

29 C.F.R. § 1620.13(b)(4). Defendants contend that Black's claim necessarily fails because Burkart succeeded Black at a lower rate of pay.

Plaintiff offers several arguments in response. For one, she argues that it was unfair for Burkart to have received even $56.00 per hour because he was much less skilled and experienced than her. Black contends that she has practiced law for 15 years longer than Burkart has. But this argument – with its focus on the relative skills and experience of Black and Burkart – is of no avail. A plaintiff establishes a *prima facie* case "by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." *Beck-Wilson v. Principi*, 441 F.3d 353, 362–63 (6th Cir. 2006) (internal quotation marks omitted).

Next, plaintiff argues that Burkart's rate of pay was unfair because the job duties of Chief Legal Counsel shrank once Hughes appointed him to that position. Black had to supervise the Human Resources Department for a time while she was Chief Legal Counsel, but Hughes removed oversight of HR from the scope of Burkart's duties. *See* March 7, 2023 Black Aff., ¶ 4. This argument too is of no avail, as it is undisputed that, even if Burkart did less work, he earned lower wages. Plaintiff has not demonstrated how this situation violates the Equal Pay Act's "principle of equal pay for equal work regardless of sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974).

15

Finally, plaintiff contends that the Commission discriminated in its wage practices because it increased Burkart's pay at a higher percentage rate than it did hers. Burkart received a second raise on April 11, 2021, increasing his pay to $58.83 per hour. *See* Doc. 55-2 at PAGEID 981. A third raise increased his pay to $62.36 per hour on June 20, 2021, and a fourth increased it to $64.23 on June 19, 2022. *See id.* Plaintiff contends that she did not receive the same sort of pay increases. In her first three years on the job (October 2013 to October 2016), Black's pay increased from $48.12 to $53.06, which is an overall percentage increase of 10.3%, or annual increase of 3.4%. *See* Doc. 53-7 at PAGEID 907. In Burkart's first three years, his hourly pay increased from $56.00 to $64.23, which is overall increase of 14.7%, or annual increase of 4.9%.

The Court rejects plaintiff's theory for three reasons. First, plaintiff's claim for allegedly unequal wages before June 1, 2018 is time-barred, as the Court held in its order on the motion to dismiss. *See* Doc. 43 at PAGEID 259. Plaintiff argues that her pay during her first several years as Chief Legal Counsel was unequal when compared to Burkart's pay, but she cannot save the time-barred claim simply by using her successor as the comparator. If one looks only at the time period available for recovery, Black received two raises that increased her hourly pay from $54.39 on June 1, 2018 to $58.82 by the time of her revocation on July 29, 2019 – an overall percentage increase of 8.1%. *See* Doc. 53-7 at PAGEID 906–07. Burkart's first two pay raises, which took 21 months to obtain due to a pay freeze during the COVID-19 pandemic, increased his hourly pay from $56.00 to $58.83 – an increase of just 5.1%. *See* Colasurd Aff., ¶ 9.

Second, even if plaintiff's claim was not time-barred, defendants have produced evidence that factors other than sex account for the difference in the pay increases which Black and Burkart received during their respective first three years on the job. The difference is explained by a pay freeze which Governor Kasich imposed on exempt state employees from 2011 until 2015. *See* Colasurd Aff., ¶ 6. Black did not receive a raise during this period, until the middle of 2015. *See* Doc. 53-7 at PAGEID 907. In contrast, though Burkart's pay was frozen during the pandemic, Governor DeWine thereafter authorized state agencies to provide a series of 3% across-the-board pay raises to all exempt staff, and Burkart received those raises in April and June 2021 and in June 2022. *See id.*, ¶¶ 9–11. In addition, a policy was implemented in June 2021 to correct situations in which a subordinate earned more than a supervisor. *See id.,* ¶ 10. Such a situation existed under Burkart, and he received an additional increase of approximately 3%. *See id.*

The Court finds that defendants have met their burden of establishing that any pay differential between Black and Burkart resulted from reasons other than sex. *See E.E.O.C. v. J.C.*

16

*Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988) (holding that the affirmative defense of a "factor other than sex" is established when the employer proves a "legitimate business reason" for the wage differential). It is now plaintiff's burden to show that defendants' explanation is pretextual. *See Briggs*, 11 F.4th at 508. However, she has wholly failed to attempt to challenge the legitimacy of defendants' explanation.

Third, and perhaps most importantly, the Equal Pay Act is meant to ensure the payment of equal "wages" for equal work. 29 U.S.C. § 206(d)(1); *see also Briggs*, 11 F.4th at 507 (stating that the "Equal Pay Act prohibits employers from discriminating against an employee on the basis of sex by paying lower wages than are paid to employees of the opposite sex for performing equal work."). Plaintiff fails to cite any legal authority for the proposition that she has a viable claim under the Act against her employer for giving pay raises at unequal percentage rates when she still received a higher wage than her male successor.[6] Black's wage of $58.82 per hour exceeded Burkart's wages until April 11, 2021, when he began earning $58.83 per hour. As explained above, the Commission had legitimate reasons other than sex when it eventually increased Burkart's wages above what Black made. Plaintiff has not demonstrated that those reasons are pretextual.

The Court thus finds that defendants are entitled to summary judgment on plaintiff's Equal Pay Act claim.

### C. State Law Claims

Plaintiff has asserted claims for gender and national origin discrimination under Ohio Revised Code § 4112.02. Defendants argue that the state law claims are barred by sovereign immunity, and the Court agrees.

The Industrial Commission is an arm of the State of Ohio, *see* O.R.C. § 4121.02, and is entitled to sovereign immunity under the Eleventh Amendment to the United States Constitution. *See Sossamon v. Texas*, 563 U.S. 277, 284 (2011); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). A state may choose to waive its immunity in federal court, but a court will not exercise jurisdiction unless the state's consent to suit is "'unequivocally expressed.'" *Sossamon*, 563 U.S. at 284 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)). Consent may expressed through legislation or by the state removing an action to federal court or "appearing without objection and

---

[6] Though plaintiff has not, an employee alleging discriminatory practices by an employer in awarding pay raises could assert a claim under Title VII. *See Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (Title VII "prohibit[s] all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin.").

defending on the merits." *Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006) (internal quotation marks omitted).

The State of Ohio has consented to suit in the Ohio Court of Claims. *See* O.R.C. § 2743.02. Its waiver of immunity is limited in scope and cannot be broadened. *See Sossamon*, 563 U.S. at 285 ("[A] waiver of sovereign immunity 'will be strictly construed, in terms of its scope, in favor of the sovereign.'") (quoting *Lane v. Peña*, 518 U.S. 187, 192 (1996)). Thus, "a State's consent to suit in its own courts is not a waiver of its immunity from suit in federal court." *Id.* (citing *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675 (1999)).

Plaintiff argues that defendants consented to suit by not raising the sovereign immunity issue in their motion to dismiss. But the authority she cites does not support her proposition. In the cited case, *Ku v. State of Tennessee*, 322 F.3d 431 (6th Cir. 2003) the Sixth Circuit held that a state had waived sovereign immunity by waiting until after the claims at issue had been resolved on the merits. Notably, the state failed to raise the immunity defense in its summary judgment motion. *See id.* at 432 (". . . Tennessee appeared without objection to the district court's jurisdiction over this federal question and defended the suit on the merits, engaging in substantial discovery and filing a motion for summary judgment. It was only after a final adverse ruling by the district court that Tennessee raised the Eleventh Amendment immunity defense.").

Here, defendants' motion to partially dismiss the complaint did not concern the state law claims. It concerned only the Title VII and Equal Pay Act claims, for which sovereign immunity is not a bar. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 447–448 (1976) (Title VII abrogates state sovereign immunity); *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 816 (6th Cir. 2000) (Equal Pay Act abrogates state sovereign immunity). Defendants thus did not attempt to litigate the state law claims on the merits at the motion to dismiss stage.

After the Court ruled on the motion to partially dismiss the complaint, defendants filed an Answer which plainly raised the immunity defense: "Plaintiff's state law claims against Defendants are barred by sovereign immunity under the Eleventh Amendment of the United States Constitution." Doc. 45, ¶ 94. The Court finds that the Commission and defendants Hughes and Adams in their official capacities have not consented to suit with respect to the state law claims. Those claims are therefore barred. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520–21 (6th Cir. 2007) ([P]endent state law claims against state officials in their official capacity are barred by the Eleventh Amendment.").

Plaintiff's state law claims against Hughes and Adams in their individual capacities are also barred by sovereign immunity. Ohio law provides for a narrow waiver of immunity by which a plaintiff must first go to the Court of Claims for a determination that an "employee's conduct was manifestly outside the scope of [his] employment or official responsibilities" or that the "employee acted with malicious purpose, in bad faith, or in a wanton reckless manner." O.R.C. § 2743.02(F); *see also* O.R.C. § 9.86, *McCormick v. Miami Univ.*, 693 F.3d 654, 664–65 (6th Cir. 2012).

Plaintiff has not shown that the Ohio Court of Claims has made the requisite determination. Thus, the state law claims against Hughes and Adams in their individual capacities are barred by sovereign immunity. *See Haynes v. Marshall*, 887 F.2d 700, 705 (6th Cir. 1989) ("Ohio law requires that, as a condition precedent to asserting a cause of action against a state employee in his individual capacity, the Court of Claims must first determine that the employee is not entitled to the immunity provided for in Revised Code section 9.86.").

## IV. Conclusion

Accordingly, defendants' motion for summary judgment (doc. 55) is GRANTED. Plaintiff's motion for summary judgment on her Equal Pay Act claim (doc. 56) is DENIED. The Clerk of Court shall enter judgment in favor of the defendants.

*s/ James L. Graham*
JAMES L. GRAHAM
United States District Judge

DATE: September 12, 2023